IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARIBA, INC., | No. C-11-01619 EDL |
| Plaintiff, | **ORDER DENYING PLAINTIFF'S MOTION TO DISMISS; DENYING PLAINTIFF'S MOTION TO STRIKE; AND DENYING WITHOUT PREJUDICE DEFENDANT'S MOTION TO STAGE AND/OR BIFURCATE DISCOVERY** |
| v. | |
| REARDEN COMMERCE, INC., et al., | |
| Defendants. | |

On April 1, 2011, Plaintiff Ariba, Inc. filed this action against Defendants Rearden Commerce, Inc. and Ketera Technologies, Inc., alleging claims for, among other things, copyright infringement and breach of contract. On April 26, 2011, Defendants filed an answer along with counterclaims alleging breach of contract, intentional interference with contract, breach of the implied covenant of good faith and fair dealing and violation of California Business and Professions Code section 17200. On June 17, 2011, Ariba filed a Motion to Dismiss and Motion to Strike. These motions were fully briefed and the Court held a hearing on August 23, 2011.[1] For the reasons stated at the hearing and in this Order, the Court denies Ariba's Motion to Dismiss and Motion to Strike.

**Motion to Dismiss**

Ariba seeks to dismiss Defendants' counterclaims for: (1) intentional interference with contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) unlawful or unfair

---

[1] At the August 23, 2011 hearing, the Court also heard argument on Rearden and Ketera's motion to bifurcate, which was filed on July 19, 2011. The Court ordered the parties to meet and confer about bifurcation of discovery, and to file a joint letter outlining the parties' agreements and remaining disputes. On September 6, 2011, the parties filed a joint letter informing the Court that they have adopted an approach to discovery such that there is no immediate need for the Court to resolve any dispute. Therefore, the motion to stage and/or bifurcate is denied without prejudice.

business practices under California Business and Professions Code section 17200.

**A.    Allegations from the counterclaim**

Rearden is a California corporation having its principal place of business in Foster City, California. Answer to the Complaint and Counterclaims ("CC") (docket no. 8) ¶ 6. It is a technology company focusing on personalizing the web by building software designed to provide users with personal internet assistance that can connect to a standardized platform for electronic commerce. Id. Rearden's corporate customers use the software to allow their employees to purchase or reserve services such as airline travel from their desktops or mobile devices. Id.

Ketera is a Delaware corporation having its principal place of business in San Jose, California. CC ¶ 7. Ketera merged with a subsidiary of Rearden on November 30, 2010. Id.

Ariba is a Delaware corporation having its principal place of business in Sunnyvale, California. CC ¶ 8. Ariba is a provider of collaborative business commerce solutions. Id.

On August 1, 2000, Ariba entered into a Software License Agreement with Ventro Corporation. CC ¶ 11; Gasner Decl. Ex. B. Under that agreement, Ventro had the rights to use designated Ariba software and to access and use the source code related to the Ariba software to develop its own software applications that interface and interact with the Ariba software. Id.

On December 20, 2001, Ariba acknowledged that Ventro had assigned its rights under the License Agreement to a company called MarketMile LLC. CC ¶ 12; Gasner Decl. Ex. D. Under the 2001 Amendment, MarketMile and Ariba modified portions of the License Agreement and made the license perpetual upon payment of certain subscription fees. Id. Those subscription fees were paid in December 2001 and the license became perpetual, subject only to termination as provided in Section 10 of the License Agreement.[2] Id. Under section 10 of the License Agreement, Ariba had the right to terminate the License Agreement in the event that the licensee: (1) "shall materially breach any provision of this Agreement and shall fail to cure such material breach within 60 days after receiving written notice of termination from Ariba specifying the alleged breach;" or (2) "if Licensee fails to pay when due any fees for the Software and continues to be delinquent for a period

---

[2]    Ariba maintains that the 2001 amendment also deleted Schedule K, which was the Source Code Access Agreement, and that therefore, the parties reverted to the Online Source Code Agreement, which is a click-through agreement on Ariba's website. Gasner Decl. Ex. D.

2

of 30 days after receipt of written notice of non-payment." CC ¶ 13.

In August 2002, MarketMile changed its name to Ketera Technologies. CC ¶ 14. Ketera has paid all fees due and has otherwise complied with its obligations under the License Agreement and the 2001 Amendment. Id. ¶ 15.

The License Agreement and the 2001 Amendment contained an assignment clause that provided in relevant part that:

> For purposes of this Agreement, and except as otherwise described herein, neither party shall assign its rights and obligations hereunder without the prior written consent of the other party, such consent not to be unreasonably withheld. However, either party shall have the right to assign its rights and obligations under this Agreement, in their entirety, upon written notice to the other party, so long as such assignment is in connection with the assignor's sale of all or substantially all of its assets, or merger or consolidation by operation of law to a creditworthy third party. Prior to an assignment by Licensee of its rights and obligations under this Agreement pursuant to the previous sentence, in their entirety, the parties will negotiate in good faith, to determine the additional fees, if any, to be paid by the resulting assignee of the assignment. . . . In no event may Licensee assign this Agreement to an Ariba competitor.

CC ¶ 18. "Ariba Competitor" is defined in the License Agreement, and "shall mean up to forty (40) third parties listed on Schedule J, as such Schedule may be amended from time to time by Ariba on ninety (90) days advance written notice to Licensee, whose primary focus is the development and/or distribution of business to business e-commerce software solutions enabling companies to host online marketplaces or trading communities." Id. ¶ 20.

On November 19, 2010, Ketera alleges that it complied with the License Agreement by sending a letter to Ariba giving written notice of its merger with Rearden and any attendant assignment of its rights and obligations under the License Agreement by operation of law. CC ¶ 19; Gasner Decl. Ex. E. Rearden is not listed in the License Agreement as a competitor. Id. ¶ 20. The November 19, 2010 letter stated that Ketera would continue to remain fully liable for any and all obligations accruing under the License Agreement. Id. ¶ 21. Ketera believed that no additional fees were warranted due to the merger, but was ready to negotiate the issue with Ariba. Id.

On November 29, 2010, Ariba sent Ketera a letter alleging that Ketera was in breach of the License Agreement for undertaking an improper assignment and failing to provide certain fee reports and pay certain fees due. CC ¶ 22; Gasner Decl. Ex. F. Ariba also stated in the letter that the

3

advance written notice Ketera provided was not adequate. Id. Ariba also claimed that Ketera refused to negotiate over fees under the License Agreement, but Ariba did not attempt to enter into any negotiations prior to sending its letter. Id. Ariba's letter also claimed termination of the License Agreement based on an alleged failure to send payment reports and pay certain Marketplace Revenue Share fees due, the last of which were due and paid in full over five years prior. Id. ¶ 23. Rearden and Ketera allege that Ariba only included the claims of breach relating to the Marketplace Revenue Share fees as a basis to seek termination in thirty days rather than sixty days as required by the License Agreement. Id. ¶¶ 23-24. In the November 29, 2010 letter, Ariba also demanded that Ketera cease use of all Ariba software and certify in writing that it had not retained any copies of the software, the software documentation, or any other proprietary or confidential information of Ariba. Id. ¶ 25.

On November 30, 2010, a wholly-owned subsidiary of Rearden merged with Ketera. CC ¶ 27. Upon the merger, Ketera survived as a wholly-owned subsidiary of Rearden. Id.

On December 27, 2010, Rearden and Ketera responded to Ariba's November 29, 2010 letter and denied any breach of the License Agreement and any failure to pay past fees due. CC ¶ 28; Gasner Decl. Ex. H. They pointed out that Ariba failed to provide the contractually-required sixty-day period to cure prior to termination. Id. Rearden and Ketera affirmed Ariba that they were willing to negotiate in good faith for additional fees even though they did not think any additional fees were due. Id.

On December 29, 2010, Ariba sent Rearden and Ketera a letter conceding that it would not terminate prior to sixty days. CC ¶ 29; Gasner Decl. Ex. I. Ariba continued to claim, however, that Ketera failed to provide adequate notice of the merger, and failed to pay fees or enter into negotiations concerning the assignment. Id.

On January 10, 2011, Ariba sent a letter to Ketera alleging that Ketera had breached certain alleged standardized online click-through terms in the Online Source Code Agreement, which Ariba stated was operable as of the December 2001 amendment. CC ¶ 31: Gasner Decl. Ex. J. According to the January 10, 2011 letter, the Online Source Code Agreement barred any assignment or transfer, by merger or otherwise, of the rights and obligations to Ariba's source code, and provided for

4

immediate termination in the event of an assignment or transfer. Id. ¶ 32. Ariba claimed that the merger between Rearden and Ketera violated those provisions and thus, Ariba purported to terminate immediately the alleged Online Source Code Agreement. Id. In that January 10, 2011 letter, Ariba additionally claimed that the online terms gave it a perpetual license to any modifications, enhancements, improvements to, or derivative works Ketera made from Ariba source code, and demanded that Ketera deliver all such work product to Ariba. Id. ¶ 33. The letter also demanded that Ketera destroy all Ariba information and all other proprietary or confidential materials belonging to Ariba, and certify in writing that it had not retained any copies of Ariba information. Id. ¶ 35.

Ketera alleges that it does not have any source code in its possession that would be subject to the Online Source Code Agreement. CC ¶ 36. Ketera alleges that the source code in its possession is governed by Section K of the License Agreement, which provided Ketera with access to and use of the source code to develop licensee applications, which are defined as "software applications (and any documentation thereof) developed by Licensee, which were designed to electronically interface and interact with the Software and which provide enhancements and/or supplemental functionality or functionality separate and apart from the Software functionality." Id. ¶ 37. Defendants allege that the 2001 Amendment did not modify Section K.[3] Id. p 40.

On January 19, 2011, Ketera sent a letter to Ariba attempting to fulfill any obligations it had under the License Agreement, and stating its willingness to make a one-time additional subscription fee payment of $100,000. CC ¶ 41; Gasner Decl. Ex. L. Defendants allege that by letter dated January 24, 2011, Ariba refused to negotiate, again claiming that the negotiations could only take place prior to the merger. Id.

Ketera alleges that because of Ariba's claims of breach and purported termination of the License Agreement effective January 28, 2011, Rearden and Ketera have been forced to "stall integration of their software and businesses." CC ¶ 42. Rearden also was compelled to file a declaratory relief action in Santa Clara County Superior Court, which was stayed pending resolution

---

[3] Section 12(e) of the License Agreement provides that no amendment of the Agreement shall be binding unless the amendment is reduced to writing and executed by the parties to the Agreement, and identified as an amendment to the Agreement. CC ¶ 39.

United States District Court
For the Northern District of California

5

of this action. Id. After Rearden filed that state court action, Ariba allegedly asked Rearden to postpone serving the complaint so that the parties could attempt to settle their disputes. Id. When settlement negotiations were not successful, Ariba filed this action on April 1, 2011. Rearden and Ketera brought counterclaims for: (1) breach of contract; (2) breach of the implied covenant of good faith and fait dealing; (3) intentional interference with contract; and (4) violation of California Business and Professions Code section 17200. Now Plaintiff moves to dismiss all claims except for the breach of contract claim.

**B.  Legal Standard**

A complaint will survive a motion to dismiss if it contains "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007)). The reviewing court's "inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." Lazy Y Ranch LTD v. Behrens, 546 F.3d 580, 588 (9th Cir. 2008).

A court need not, however, accept as true the complaint's "legal conclusions." Iqbal, 129 S. Ct. at 1949. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 1950. Thus, a reviewing court may begin "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

Courts must then determine whether the factual allegations in the complaint "plausibly give rise to an entitlement of relief." Id. Though the plausibility inquiry "is not akin to a probability requirement," a complaint will not survive a motion to dismiss if its factual allegations "do not permit the court to infer more than the mere possibility of misconduct . . . ." Id. at 1949 (internal quotation marks omitted) & 1950. That is to say, plaintiffs must "nudge[] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

**C.  Discussion**

    **1.  Intentional Interference with Contract**

The elements of a claim for intentional interference with contract are: "(1) a valid contract

6

between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." Pacific Gas & Electric Co. v. Bear Stearns & Co. 50 Cal.3d 1118, 1126 n.2 (1990). There is no requirement that the defendant's conduct be wrongful. See Della Penna v. Toyota Motor Sales, 11 Cal.4th 376, 392-93 (1995) ("The notion that inducing the breach of an existing contract is simply a subevent of the 'more inclusive' class of acts that interfere with economic relations, while perhaps theoretically unobjectionable, has been mischievous as a practical matter. Our courts should, in short, firmly distinguish the two kinds of business contexts, bringing a greater solicitude to those relationships that have ripened into agreements, while recognizing that relationships short of that subsist in a zone where the rewards and risks of competition are dominant. . . . It is sufficient to dispose of the issue before us in this case by holding that a plaintiff seeking to recover for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful 'by some measure beyond the fact of the interference itself.'"); see also CRST Van Expedited, Inc. v. Werner Enters., 479 F.3d 1099, 1108 (9th Cir. 2007) ("The primary difference between the two torts is that, unlike intentional interference with existing contractual relations, interference with prospective economic advantage requires a plaintiff to allege an act that is wrongful independent of the interference itself.").

Rearden and Ketera allege that they entered into a contract for Ketera to merge with a subsidiary of Rearden. CC ¶ 65. They allege that Ariba had knowledge of the proposed merger contract when Ketera sent Ariba the required notice on November 19, 2010. Id. ¶ 66. They allege that instead of attempting good faith negotiations regarding the possibility of any additional fees due under the License Agreement, Ariba responded to Ketera's letter on November 29, 2010 by claiming that any merger would be a breach of the License Agreement. Id. ¶ 67. Rearden and Ketera allege that "Ariba thus intentionally refused to negotiate in good faith and comply with the License Agreement, and instead, claimed an incurable breach of the License Agreement if Ketera complied with its contractual obligation to merge with Rearden." Id. They allege that Ariba's November 29, 2010 letter was intentionally designed to induce a breach or disruption of the contractual relationship

7

between Rearden and Ketera. Id. Further, Rearden and Ketera allege that: "This letter, Ariba's continued refusal to engage in the required good faith negotiation under the License Agreement, and Ariba's continued claims of breach have caused actual disruption of the contractual relationship between Ketera and Rearden." Id. As an example, they allege that Ariba's conduct has interfered with Rearden's integration of the Licensee Applications developed by Ketera into Rearden's suite of software applications. Id. They also allege that because of Ariba's actions, Rearden has been forced to slow the integration of Ketera under the merger contract, thus making both Rearden and Ketera's performance more burdensome and expensive, resulting in damages to both Defendants. Id. ¶ 68.

Ariba argues that Rearden and Ketera have not stated a claim for intentional interference with contract for two reasons: (1) because the allegations sound in contract and cannot support a tort claim; and (2) because there is a lack of causation.

### a. Claims sounding in contract or tort

Ariba argues that it cannot be liable for interfering with a contract between Rearden and Ketera based merely on its assertion of rights under its own contract with Ketera, even if those assertions are erroneous. See, e.g., Roots Ready Made Garments v. Gap, Inc., 2007 WL 3045999, at *4 (N.D. Cal. Oct. 18, 2007) ("California recognizes a cause of action against noncontracting parties who interfere with the performance of a contract or with prospective business relations. However, a plaintiff cannot not simply present evidence of a breach of contract and use the same activity to recover tort damages under a theory of negligent interference."); Ilkhchooyi v. Best, 37 Cal.App.4th 395, 411-12 (1995) ("'Conduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort law.' These were parties to a commercial lease; as such, they were in no special relationship that would give rise to a duty in tort.") (internal citation omitted). These cases, however, are inapposite. Roots involved a negligent interference claim, which requires an additional showing of wrongfulness, and here, the claim is for intentional interference. Further, unlike in Ilkhchooyi, Ariba's conduct here was alleged to be intentional, not incidental, and Rearden alleges that Ariba's entire course of conduct has been directed at slowing down and disrupting the Rearden and Ketera merger because Ariba feared enhanced competition from Rearden, even though Rearden is not listed as a competitor in the License Agreement. CC ¶¶

8

67-68; see also CC ¶ 1 (". . . Ariba has engaged in a concerted course of conduct aimed at interfering, disrupting, and delaying that merger, which it apparently sees as a competitive threat.").

Ariba also argues that the mere assertion of legal rights by a contracting party cannot give rise to tort liability, in the absence of allegations such as contact with Defendants' customers, commission of fraud, or prevention of the merger, relying on Arntz Contracting Co. v. St. Paul Fire & Marine Ins., 47 Cal.App.4th 464, 479 (1996) ("A contracting party's unjustified failure or refusal to perform is a breach of contract, and cannot be transmuted into tort liability by claiming that the breach detrimentally affected the promisee's business."). Arntz, however, did not involve intentional interference with contract.

Further, Ariba notes strong similarities between the allegations for the breach of contract counterclaim and the intentional interference claim, arguing that the latter is just a recasting of the former and should therefore be dismissed. Compare, e.g., CC ¶¶ 52-53 (from breach of contract counterclaim: "Ariba has breached by purporting to terminate when Ketera has not materially breached any provision of the Agreement. [¶] Section 12(c) of the License Agreement requires both parties to negotiate in good faith to determine if there are any additional fees due by the resulting assignee. At no point has Ariba attempted to negotiate any additional fees with Ketera or Rearden under the Negotiation Clause. Ariba has breached this provision by sending a Notice of Termination rather than undertaking a good faith effort to negotiate, and continuing to refuse to undertake any such efforts, despite Ketera's attempts to do so."); with, e.g., CC ¶ 67 (from intentional interference with contract claim: "Instead of attempting good faith negotiations regarding the possibility of any additional fees due under the License Agreement, Ariba responded by claiming any merger would be a breach of the License Agreement. Ariba thus intentionally refused to negotiate in good faith and comply with the License Agreement, and instead, claimed an incurable breach of the License Agreement if Ketera complied with its contractual obligation to merge with Rearden. This November 29, 2010 letter from Ariba to Ketera was intentionally designed to induce a breach or disruption of Ketera and Rearden's contractual relationship. This letter, Ariba's continued refusal to engage in the required good-faith negotiation under the License Agreement, and Ariba's continued

9

claims of breach have caused actual disruption of the contractual relationship between Ketera and Rearden. For example, it has interfered with Rearden's integration of the Licensee Applications developed by Ketera into Rearden's suite of software applications."). In their intentional interference with contract claim, however, Rearden and Ketera have alleged that Ariba has done more than merely assert its rights under a contract. They allege that Ariba intentionally interfered by, for example, claiming that the merger would be a breach of the License Agreement and failing to negotiate additional license fees. Thus, Ariba has not shown that the intentional interference claim is a mere recasting of the breach of contract claim.

Ariba further argues that the claim of intentional interference with contract fails even though Defendants have alleged that Ariba's conduct was intentional, relying on JRS Prods. v. Matsushita Elec. Corp., 115 Cal.App.4th 168, 182 (2004) (finding that claim for intentional interference with prospective economic advantage to which motive was irrelevant, sounded in contract: "Thus motive, regardless of how malevolent, remains irrelevant to a breach of contract claim and does not convert a contract action into a tort claim exposing the breaching party to liability for punitive damages.") and Ilkhchooyi, 37 Cal.App.4th at 412. However, JRS, like other cases on which Defendants rely, involved a claim for intentional interference with prospective economic advantage, not a claim for intentional interference with contract. The former requires the additional allegation that an act is wrongful independent of the interference itself, unlike a claim for intentional interference with contract to which intent is relevant.

Moreover, Ariba's reliance on Imperial Ice Co. v. Rossier,18 Cal.2d 33 (1941) is misplaced. Although the Imperial Ice court stated that "if two parties have separate contracts with a third, each may resort to any legitimate means at his disposal to secure performance of his contract even though the necessary result will be to cause a breach of the other contract" (id. at 37), here, Defendants allege that Ariba's conduct was intentionally aimed at a perceived competitor, not that the conduct was merely incidental to an assertion of contractual rights. As Imperial Ice court explained:

> It is well established, however, that a person is not justified in inducing a breach of contract simply because he is in competition with one of the parties to the contract and seeks to further his own economic advantage at the expense of the other. . . . Again, if two parties have separate contracts with a third, each may resort to any legitimate means at his disposal to secure performance of his contract even though the necessary result will be to cause a breach of the other contract. A party may not,

10

> however, under the guise of competition actively and affirmatively induce the breach of a competitor's contract in order to secure an economic advantage over that competitor. The act of inducing the breach must be an intentional one. If the actor had no knowledge of the existence of the contract or his actions were not intended to induce a breach, he cannot be held liable though an actual breach results from his lawful and proper acts.

Imperial Ice, 18 Cal.2d at 36-37 (internal citations omitted); see also Webber v. Inland Empire Invs., Inc., 74 Cal.App.4th 884, 902 (1999) ("The trial court held in that context that Sanwa's desire to receive payment of its note was sufficient legal justification for the interference with plaintiff's note with Forecast Mortgage. We affirmed, noting that '[a]s a creditor, Sanwa was entitled to take all legal steps to obtain payment of the debt owed to it, even if the result was that Forecast would default on its obligation to the other creditor, Mr. Webber.' Thus, after Inland purchased the note, it had the same rights as Sanwa to attempt to collect on it. However, that right did not extend to participation in a sham foreclosure designed for the specific purpose of eliminating the junior lien. . . . In other words, Inland's right to collect on the note did not extend to intentional acts designed to disrupt the contractual relationship embodied in the junior lien."). The Imperial Ice court also stated that when a party actively causes a third party to breach a contract with that party's competitor to further its own economic advantage, an action for intentional interference can lie. Id. at 38-39 ("The statements [in Boyson v. Thorn, 98 Cal. 578 (1893)] to the effect that no interference with contractual relations is actionable if the means employed are otherwise lawful were not necessary to the decision and should be disregarded.").

Here, Defendants have alleged more than a breach of contract, including, among other things, that Ariba's conduct was intentionally aimed at disrupting the merger, which it saw as a competitive threat. Thus, the intentional interference with contract claim is more than just a recasting of the contract claim.

### b. Causation

Ariba argues that its conduct could not have, and did not, result in interference with or actual disruption of the merger contract because the merger went forward only one day after Ariba's November 29, 2010 letter, and the three other letters by Ariba were sent after the merger and so could not have affected it. Ariba contends that the counterclaims do not allege that the merger

11

1  contract required Ketera to assign to or otherwise grant its rights and obligations under the License
2  Agreement with Rearden, and that there is nothing in the counter-complaint indicating that Rearden
3  and Ketera were required to perform the integration of Ketera's applications. Ariba also argues that
4  Defendants cannot assert that Ariba's conduct had any negative impact on their performance under
5  the merger contract because Defendants have admitted that they completed the merger one day after
6  Ariba's first letter.

At the pleading stage, however, the counterclaims are sufficient to survive a motion to dismiss, as they include allegations about merger-related activities that were to take place after the merger. See CC ¶ 19 ("On November 19, 2010, Ketera complied with the License Agreement by sending a letter to Ariba giving written notice of its merger with Rearden Commerce and any attendant assignment of its rights and obligations under the License Agreement by operation of law."); CC ¶ 67 ("For example, it has interfered with Rearden's integration of the Licensee Applications developed by Ketera into Rearden's suite of software applications."); ¶ 68 ("Rearden has been forced to slow integration of Ketera under the contractual merger relationship, thus making both Reardon and Ketera's performance under the merger contract both more burdensome and expensive."). Thus, the motion to dismiss the intentional interference claim is denied.

### 2. Breach of implied covenant of good faith and fair dealing

The covenant of good faith and fair dealing is an implied term arising out of a contract itself. Kim v. Regents of Univ. of Cal., 80 Cal.App.4th 160, 164 ( 2000). "The existence of a contractual relationship is thus a  prerequisite for any action for breach of the covenant." Id. "It is universally recognized the scope of conduct prohibited by the covenant of  good faith is circumscribed by the purposes and express terms of the  contract." Carma Developers (California), Inc. v. Marathon Development  California, Inc., 2 Cal.4th 342, 373 (1992) (stating that an implied covenant of good faith and fair dealing cannot contradict the express  terms of a contract). "A cause of action for breach of the implied covenant of good faith and fair dealing is premised on the breach of a specific contractual obligation." Innovative Business Partnerships, Inc. v. Inland Counties Regional Center, Inc, 194 Cal.App.4th 623, 631 (2011); see also Racine & Laramie, Ltd. v. Department of Parks & Recreation, 11 Cal.App.4th 1026, 1031 (1992) (the purpose of the implied

12

1 covenant is to "'prevent a contracting party from engaging in conduct which ... frustrates the other
2 party's rights to the benefits of the contract.'").

3       Here, Rearden and Ketera allege that the License Agreement was a valid contract, and that
4 Ketera has performed and is willing to perform all obligations under the contract. CC ¶¶ 56-57.
5 They allege that Ketera provided advance written notice of the merger to Ariba. Id. ¶ 58. Ketera
6 alleges that it was at all times willing to negotiate in good faith with Ariba regarding the possibility
7 of additional license fees. Id. ¶ 59. Rearden and Ketera allege that Ariba unfairly interfered with
8 Ketera's rights to receive the benefits of the License Agreement, which included, among other
9 things, the right to assign the License Agreement in connection with a merger without Ariba's
10 consent. Id. ¶ 60. They allege that Ketera fully complied with its obligations under the License
11 Agreement, but that Ariba sought to thwart the merger between Rearden and Ketera, and Ketera's
12 continuing operations by refusing to respond to attempts at negotiation, falsely claiming breach of
13 contract, purporting to terminate the License Agreement and attempting to enforce against Ketera a
14 supposed form click-through contract that has no force over any source code actually in Ketera's
15 possession. Id.; see also CC ¶ 42 ("Because of Ariba's meritless claims of breach and purported
16 termination effective January 28, 2011 of Ketera's rights under the License Agreement and alleged
17 Online Source Code Agreement, Rearden and Ketera have been forced to stall integration of their
18 software and businesses."). Rearden and Ketera also allege that Ariba has trumped up additional
19 new baseless arguments in its complaint, including the claim that Rearden is a competitor and the
20 alleged failure by Defendants to display the "Powered by Ariba" logo, in disregard of its obligation
21 under the contract to allow time for cure. Id. ¶ 61. Rearden and Ketera further allege that Ariba
22 claimed to base its purported termination in part on a ground that it has now abandoned, that is, the
23 alleged failure to pay Marketplace Revenue Share fees due. Id. ¶ 62. Ketera alleges that it was
24 damaged as a result of this conduct. Id. ¶ 63.

25       The issue here is whether Defendants have pled allegations that are sufficiently distinct
26 from their underlying breach of contract claim. See In re Facebook PPC Adver. Litig., 709 F. Supp.
27 2d 762, 770 (N.D. Cal. 2010) ("'[i]f the allegations in a breach of implied covenant claim "do not go
28 beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek

13

1 the same damages or other relief already claimed in a companion contract cause of action, they may
2 be disregarded as superfluous as no additional claim is actually stated.'"") (quoting Schulken v.
3 Wash. Mut. Bank, 2009 WL 4173525 (N.D.Cal. Nov. 19, 2009) (citing Careau & Co. v. Sec. Pac.
4 Bus. Credit, Inc., 222 Cal.App.3d 1371, 1395 (1990)). Ariba argues that when viewed side by side,
5 the allegations in the counterclaims for breach of contract and breach of the implied covenant of
6 good faith and fair dealing are the same, that is, Ariba's assertion of its contractual rights under both
7 the Software License Agreement and the Online Source Code Agreement, and that therefore, the
8 breach of the implied covenant claim is superfluous. Compare CC ¶¶ 52-53 (alleging that Ariba
9 breached Section 12(c) of the License Agreement by refusing to negotiate in good faith regarding
10 additional fees to be paid and instead issued a Notice of Termination), with CC ¶¶ 60-62 (alleging
11 that Ariba unfairly interfered with Ketera's sights to receive the benefits of the License Agreement,
12 Ariba refused to negotiate, Ariba falsely claimed breach of contract, Ariba purported to terminate
13 the License Agreement, Ariba attempted to enforce the Online Source Code Agreement, and Ariba
14 failed to allow time for cure).

15       At the pleading stage, however, the alleged conduct underlying each claim is somewhat
16 distinct. Ketera's claim for breach of the implied covenant seeks redress for a seemingly wider
17 range of conduct by Ariba undertaken to deprive Ketera of the benefits of its contractual right to
18 assign the License Agreement through merger with Rearden, including not merely Ariba's steadfast
19 refusals to engage in good-faith negotiations and purported attempt to terminate the License
20 Agreement, but also Ariba's attempt to bypass the License Agreement by seeking to enforce
21 separate online click-through terms (CC ¶ 60); new allegations of contract breach that Ariba brought
22 in this case without permitting the opportunity to cure, such as its claim that Rearden is an "Ariba
23 Competitor" and that Ketera failed to display the "Powered by Ariba" logo even though Ketera was
24 obligated to display the logo for many years prior to the merger (CC ¶ 61); and Ariba's flawed and
25 apparently abandoned assertion that Ketera had not paid Marketplace Revenue Share fees,
26 presumably so that it could avail itself of a thirty-day termination window rather than a sixty-day
27 window (CC ¶ 62). Although Ariba points out that the License Agreement covers the requirements
28 for the "Powered by Ariba" logo at Section 4(m), and therefore, that is an express, not implied, term

14

of the contract, Defendants have made a showing at this stage of the litigation that their implied covenant claim is distinct from their breach of contract claims, even if there is some overlap. Therefore, the motion to dismiss this claim is denied.

### 3. California B&P Code section 17200

California Business and Professions Code section 17200, et seq., prohibits "any unlawful, unfair or fraudulent business act or practice." "This cause of action is derivative of some other illegal conduct or fraud committed by a defendant, and a plaintiff must state with reasonable particularity the facts supporting the statutory elements of the violation." Lomboy v. SCME Mortgage Brokers, 2009 WL 1457738, at *6 (N.D. Cal. May 26, 2009) (internal citation omitted).

Rearden and Ketera allege that Ariba's unlawful and unfair business practices include:

> Ariba's intentional interference with Rearden and Ketera's merger contract through its refusal to negotiate in good faith under the License Agreement, and its failure to allege certain instances of breach in a manner allowing a good-faith attempt to cure, thereby disrupting performance of the contract and making it more burdensome and costly. Ariba's unlawful activities further include interference with Ketera's rights to receive the benefits of the License Agreement, which included, among other things, the right to assign the License Agreement in connection with a merger without Ariba's consent and the right to create and use Licensee Applications, and Ariba's attempts to enforce a click-through agreement against Ketera when it does not apply to any code in Ketera's possession.

CC ¶ 70. They allege that as a result of this conduct, Defendants are due restitution and all equitable relief. CC ¶ 71.

Ariba argues that Defendants have not satisfied the unlawful prong of section 17200. "With respect to the unlawful prong, [v]irtually any state, federal or local law can serve as the predicate for an action under section 17200." People ex rel. Bill Lockyer v. Fremont Life Ins. Co., 104 Cal. App. 4th 508, 515 (2002) (internal citation and quotation marks omitted). "'[I]n essence, an action based on Business and Professions Code section 17200 to redress an unlawful business practice 'borrows' violations of other laws and treats these violations, when committed pursuant to a business activity, as unlawful practices independently actionable under section 17200 et seq. and subject to the distinct remedies provided thereunder.'" Id. A breach of contract claim, standing alone, cannot support a section 17200 claim, unless the contract claim also constitutes unlawful, unfair or fraudulent conduct. See Wang & Wang LLP v. Banco Do Brasil, 2007 WL 915232, at *4

(E.D. Cal. Mar. 26, 2007); DocMagic, Inc. v. Ellie Mae, Inc., 745 F. Supp. 2d 1119, 1146 (N.D. Cal. 2010) ("A breach of contract may only form the basis of a section 17200 claim if that breach itself is 'unlawful, unfair, or fraudulent.'").

Ariba's argument for dismissal of this claim hinges on its argument that Defendants' other tort claims should be dismissed. Because the Court has denied the motion to dismiss those claims, Ariba's argument is not persuasive. Further, Ariba argues that common law claims such as an intentional interference with contract claim cannot support a section 17200 claim under the unlawful prong. See Nat'l Rural Telecomm Co-op v. DirecTV, 319 F. Supp. 2d 1059, 1074 n. 24 (C.D. Cal. 2003). However, the Ninth Circuit more recently held that a claim of intentional interference with contract may serve as the predicate for the unlawful prong of section 17200. See CRST, 479 F.3d at 1107 ("We conclude CRST adequately alleged a violation by Werner of the UCL by alleging Werner engaged in an 'unlawful' business practice, to wit, intentional interference with existing contracts of employment."). Thus, at this stage of the litigation, Defendants have adequately pled a claim under the unlawful prong of section 17200. Thus, the Court need not reach the issue of whether Defendants have stated a claim under the unfair prong of section 17200.

**Motion to Strike**

Ariba moves to strike allegations in Defendants' counterclaims concerning Defendants' offer of $100,000 in additional license fees after the merger, and Ariba's alleged refusal to negotiate on that issue.[4] In the alternative, Ariba seeks leave to amend the complaint to add facts relating to its own settlement offer. Defendants have no objection to Ariba amending the complaint in this manner, subject to the boundaries of confidentiality.

**A.    Relevant allegations**

On November 19, 2010, the Ketera CEO sent a letter to Ariba notifying it of its planned merger with Rearden, and stating that Rearden and Ketera would continue to adhere to any and all obligations under the License Agreement dated August 1, 2000 and the December 20, 2001 amendment. CC ¶¶ 19-21. This letter was written pursuant to Section 12(c) of the License

---

[4] Ariba seeks to strike the following page/lines: 23:22-27, 24:6-8, 24:24-25, 25:9-11, 25:19-23, 26:10-11, 26:16-17, 27:12-16, 27:18-19, 28:8-9.

16

Agreement, which provides in part:

> Either party shall have the right to assign its rights and obligations under this Agreement, in their entirety, upon written notice to the other party, so long as such assignment is in connection with the assignor's sale of all or substantially all of its assets, or merger or consolidation by operation of law to a creditworthy third party.

Shek Decl. Ex. A at ¶ 12(c). Section 12(c) also states that: "prior to an assignment by Licensee of its rights and obligations under this Agreement . . . in their entirety, the parties will negotiate in good faith to determine the additional fees, if any, to be paid by the resulting assignee of the assignment." Id. Ketera stated in its letter that it was willing to negotiate. CC ¶¶ 19-21.

On November 29, 2010, Ariba responded to Ketera's letter and asserted that Ketera had breached the License Agreement by failing to provide sufficient advance written notice of the merger and by failing to negotiate additional fees. CC ¶ 22. Ariba stated that the breaches were not susceptible to cure and purported to terminate the License Agreement effective in thirty days. CC ¶¶ 23-24.

On November 30, 2010, Ketera merged with Rearden. CC ¶ 27. On December 27, 2010, Rearden responded to Ariba's November 29, 2010 letter by denying that Ketera had breached the contract and, even though Defendants did not think that any additional fees were due, they informed Ariba that they were willing to negotiate additional fees during the sixty-day cure period. CC ¶ 28. Ariba responded on December 29, 2010, stating that it would not terminate the Agreement until January 28, 2011, and ignored Defendants' invitation to negotiate. CC ¶ 29.

On January 19, 2011, Ketera's CEO sent another letter to Ariba, attempting to cure any violation of the requirement to negotiate. CC ¶ 41. In that letter, Ketera offered to negotiate in good faith to determine the amount of additional fees, if any, to be paid as a result of the merger. Gasner Decl. Ex. L. Even though Ketera did not believe that any further fees were due, it also stated that it was willing to make a one-time additional subscription fee payment of $100,000. Id. By letter dated January 24, 2011, Ariba made no counter-proposal and again refused to negotiate, claiming instead that negotiations could only occur prior to the merger. CC ¶ 41. By this motion, Ariba seeks to strike all references to the $100,000 offer and Ariba's refusal to negotiate.

**B.    Legal Standard**

17

1    A court may "strike from a pleading an insufficient defense or any redundant, immaterial, 2 impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Immaterial matter is that which has no 3 essential or important relationship to the claim for relief or the defenses being plead." Cordon v. 4 Wachovia Mortgage, 2011 WL 835593, at *7 (N.D. Cal. Mar. 4, 2011) (quoting Whittlestone, Inc. v. 5 Handi–Craft Co., 618 F.3d 970, 974 (9th Cir. 2010)) (internal quotations and citation omitted). 6 "Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in 7 question." Id. (internal quotations and citations omitted).

**C.   Discussion**

Ariba has not shown that allegations relating to Defendants' $100,000 offer should be stricken. These allegations are not irrelevant or immaterial, as they relate to the nature and the timing of the negotiations envisioned by Section 12(c) of the License Agreement, which Defendants argue persuasively are key issues in this case that are not amenable to resolution through a motion to dismiss. See Whittlestone, 618 F.3d at 974 ("Thus, Handi-Craft's 12(f) motion was really an attempt to have certain portions of Whittlestone's complaint dismissed or to obtain summary judgment against Whittlestone as to those portions of the suit-actions better suited for a Rule 12(b)(6) motion or a Rule 56 motion, not a Rule 12(f) motion."). Further, Ariba has not made a showing that the allegations are scandalous or violate Federal Rule of Evidence 408.

Thus, as stated at the hearing, Plaintiff's motion to strike is denied without prejudice. Plaintiff may amend the complaint to include additional allegations about other settlement offers in this case. The Court cautions the parties to meet and confer regarding the extent of the allegations in both the complaint and counterclaim so as not to run afoul of Rule 408.

**IT IS SO ORDERED.**

Dated: September 8, 2011

*Elizabeth D. Laporte*
ELIZABETH D. LAPORTE
United States Magistrate Judge